IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| JAMES J. ENGLISH, ) | Civil Action No. 3:08-2887-MBS-JRM |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | **REPORT AND RECOMMENDATION** |
| ) | |
| MICHAEL J. ASTRUE, ) | |
| COMMISSIONER OF SOCIAL SECURITY ) | |
| ADMINISTRATION, ) | |
| ) | |
| Defendant. ) | |
| ) | |

This case is before the Court pursuant to Local Rule 83.VII.02, et seq., D.S.C., concerning the disposition of Social Security cases in this District. Plaintiff brought this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) to obtain judicial review of a final decision of the Commissioner of Social Security (the "Commissioner") denying his claims for Supplemental Security Income ("SSI").

## **ADMINISTRATIVE PROCEEDINGS**

Plaintiff protectively applied for SSI on May 23, 2001, with an alleged onset of disability of October 20, 1997. The application was denied initially, on reconsideration and, after hearing, by Administrative Law Judge (ALJ) decision dated September 24, 2003. On October 9, 2003, Plaintiff requested that the Appeals Council review the ALJ's decision. By order dated March 11, 2005, the Appeals Council remanded Plaintiff's claim for further proceedings.

Plaintiff appeared and testified at a supplemental hearing held on November 2, 2005, at which a vocational expert also appeared and testified. On March 22, 2006, ALJ Thomasine Mason issued a decision finding Plaintiff was not disabled because, with his residual functional capacity to perform

light work and under the guidelines promulgated by the Commissioner, he could perform both past relevant work and other jobs that exist in significant numbers in the national economy. See generally 20 C.F.R. Part 404, Subpt. P, App. 2.

Plaintiff was thirty-four years old at the time of ALJ Mason's decision. The ALJ found that he has an eighth grade education with past relevant work as a window tinter, welder's helper, and mobile home set-up person. (Tr. 216 ). Plaintiff alleged disability due to paranoia, seeing things, dislike of crowds, and history of a stab wound.

ALJ Mason found (Tr. 224-25):

1. The claimant has not engaged in substantial gainful activity since the alleged onset date.

2. The claimant's schizophrenia and borderline intellectual functioning are considered "severe" based on the requirements in the Regulations 20 CFR § 416.920(c).

3. These medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

4. The undersigned finds the claimant's allegations regarding his limitations are not totally credible for the reasons set forth in the body of the decision.

5. The claimant has the residual functional capacity to perform a range of work at any exertional level, restricted to preclude work in hazardous or dangerous conditions, any climbing of ladders, work around dangerous machinery, and any work other than routine, repetitive, unskilled work involving low levels of job stress.

6. The claimant's impairments do not prevent him from performing his past relevant work as a window tinter or a mobile home set-up worker (20 CFR § 416.965).

7. The claimant is a "younger individual between the ages of 18 and 44" (20 CFR § 416.963).

8. The claimant has "a limited education" (20 CFR § 416.964).

2

9. The claimant has no transferable job skills from any past relevant work (20 C.F.R. § 416.968).

10. The claimant has the residual functional capacity to perform a significant range of work at any exertional level (20 CFR § 416.967).

11. Although the claimant's exertional limitations do not allow him to perform the full range of work, using Medical-Vocational Rule 204.00 as a framework for decision-making, there are a significant number of jobs in the national economy that he could perform. Examples of such jobs include work as a commercial cleaner (3,000 such jobs in South Carolina and 122,000 in the United States); hand packer and bench hand worker (10,000 such jobs in the state and 375,000 in the nation); and garment folder (1,000 such jobs in South Carolina and 39,000 in the national economy).

12. The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of this decision (20 CFR § 416.920(g)).

On November 26, 2007, the Appeals Council denied Plaintiff's request for review (Tr. 207), thereby making ALJ Mason's determination the final decision of the Commissioner. Plaintiff then filed this action on August 19, 2008.

## **SCOPE OF REVIEW**

The Social Security Act (the "Act") provides that, for "eligible"[1] individuals, benefits shall be available to those who are "under a disability," defined in the Act as the inability:

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months[.]

42 U.S.C. § 1382c(a)(3)(A).

In evaluating whether a claimant is entitled to disability benefits, the ALJ must follow the five-step sequential evaluation set forth in the Social Security regulations. See 20 C.F.R. § 416.920.

---

[1] Eligibility requirements for SSI are found at 42 U.S.C. Section 1382(a).

3

The ALJ must consider whether a claimant (1) is working, (2) has a severe impairment, (3) has an impairment that meets or equals the requirements of a listed impairment, (4) can return to her past work, and (5) if not, whether the claimant retains the capacity to perform specific jobs that exist in significant numbers in the national economy. See id.

The scope of judicial review by the federal courts in disability cases is narrowly tailored. Thus, the only issues before this Court are whether correct legal principles were applied and whether the Commissioner's findings of fact are supported by substantial evidence. Richardson v. Perales, 402 U.S. 389 (1971); Johnson v. Barnhart, 434 F.3d 650, 653 (4th Cir. 2005). Consequently, the Act precludes a de novo review of the evidence and requires the court to uphold the Commissioner's decision as long as it is supported by substantial evidence. See Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001) (citing Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996)). Substantial evidence is:

> "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'"

Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)). It must do more, however, than merely create a suspicion that the fact to be established exists. Cornett v. Califano, 590 F.2d 91, 93 (4th Cir. 1978).[2]

---

[2]Plaintiff, citing Yzaguirre v. Barnhart, 58 Fed. Appx. 460 (10th Cir. 2003)(unpublished), argues that the correct standard for review is a "preponderance of the evidence" instead of "substantial evidence." He notes that the Tenth Circuit cited the Fourth Circuit's decision in Breeden v. Weinberger, 493 F.2d 1002 (4th Cir. 1974) to support this standard. The Fourth Circuit, however, stated:
> On review of the administrative law judge's decision, we do not assess the record to decide whether Mrs. Breeden proved her claim by a **preponderance of the evidence**. Our function is limited to deciding whether the administrative decision is supported
>                                                                                              (continued...)

Thus, it is the duty of this court to give careful scrutiny to the whole record to assure that there is a sound foundation for the Commissioner's findings, and that this conclusion is rational. Thomas v. Celebrezze, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed. Blalock v. Richardson, 483 F.2d 773, 775 (4th Cir. 1972).

## **DISCUSSION**

As a preliminary matter relevant to Plaintiff's contentions, Plaintiff had previously filed an SSI application in November 1998 alleging the same onset of disability (Tr. 45), which the Commissioner initially denied in January 1999 (Tr. 21). ALJ William Pope conducted a hearing on this application and, on August 7, 2000, issued his decision denying the claim. (Tr. 9). ALJ Pope's decision became the final decision of the Commissioner when the Appeals Council denied review. (Tr. 5). Plaintiff did not further pursue this application.

Plaintiff's 1998 application is barred from reopening as there has been no allegation of "fraud or similar fault, and the record in this case reveals no such conduct." Barton v. Secretary of Health & Human Servs., 683 F. Supp. 1024, 1029 (D.S.C. 1988). See also 20 C.F.R. § 416.1488. Thus, to the extent that Plaintiff's current arguments attempt to challenge matters settled in ALJ Pope's August 2000 decision, they are barred by res judicata. The undersigned notes that, in its Order of Remand (Tr. 297), the Appeals Council did *not* re-open ALJ Pope's decision, but rather, only

---

²(...continued)
 by **substantial evidence**.
Breeden, 493 F.2d at 1006 (emphasis added). Further, in its most recent published cases on Social Security disability claims, the Fourth Circuit has continued to use the "substantial evidence" standard. See, e.g., Hines v. Barnhart, 453 F.3d 559, 561 (4th Cir. 2006); Johnson v. Barnhart, 434 F.3d 650, 653 (4th Cir. 2005).

instructed ALJ Mason to follow established law as set out in Social Security Acquiescence Ruling (AR) 00-1(4), 65 Fed. Reg. 1936:

> [W]here a final decision of [the Social Security Administration ("SSA")] after a hearing on a prior disability claim contains a finding required at a step in the sequential evaluation process . . ., SSA must consider such finding as evidence and give it appropriate weight in light of all relevant facts and circumstances when adjudicating a subsequent disability claim involving an unadjudicated period.

Id. at 1938.

In his brief before the court, Plaintiff alleges that ALJ Mason committed several errors at step three of the sequential evaluation. The Commissioner contends that the ALJ's decision is supported by substantial evidence and free of legal error.

**The Listings**

Plaintiff complains that ALJ Mason failed to properly evaluate whether he met 12.05 of the "Listing of Impairments," provided at 20 C.F.R. Part 404, Subpart P, Appendix 1[3] (hereinafter cited as "The Listings"). The Commissioner compares the symptoms, signs, and laboratory findings of an impairment, as shown in the medical evidence, with the medical criteria for the listed impairment. "If a severe impairment is of the degree set forth in a Listing, and such impairment meets the twelve-month durational requirement, . . . then [the claimant] 'is conclusively presumed to be disabled and entitled to benefits.'" Warren v. Shalala, 29 F.3d 1287, 1290 (8th Cir. 1994) (quoting Bowen v. City of New York, 476 U.S. 467, 470-71 (1986)); see also 20 C.F.R. §416.920(a). "For a claimant to show that his impairment matches a listing, it must meet all of the specified medical criteria." Sullivan v. Zebley, 493 U.S. 521, 530 (1990). It is not enough that the impairment have

---

[3]The Listing of Impairments is applicable to SSI claims pursuant to 20 C.F.R. § 416.911.

the diagnosis of a listed impairment; the claimant must also have the findings shown in the listing of that impairment. 20 C.F.R. § 416.925(d); see Bowen v. Yuckert, 482 U.S. 137, 146 & n.5 (1987) (noting the claimant's burden to show that his impairment is presumptively disabling at step 3 of the sequential evaluation and to furnish medical evidence regarding his condition).

Here, ALJ Mason specifically stated that Plaintiff's severe impairments did not meet or equal *any* Listing, particularly 12.03 and 12.05. (Tr. 220). Additionally, the State agency medical consultants signed Disability Determination Transmittal forms (Tr. 259, 260), indicating they considered the question, but found Plaintiff did not meet or equal one of the Listings. See Social Security Ruling 96-6p, 61 Fed. Reg. 34466-01, 34468 (signature of a State agency medical consultant on the Disability Determination Transmittal form ensures consideration was given to whether a Listing is met or equaled); see also Scheck v. Barnhart, 357 F.3d 697, 700 (7th Cir. 2004) (the ALJ may properly rely on the opinions of state medical experts on the issue of whether an impairment meets or equals a listed impairment).

> The Listings state:
>
> Listing 12.05 contains an introductory paragraph with the diagnostic description for mental retardation. It also contains four sets of criteria (paragraphs A through D). If your impairment satisfies the diagnostic description in the introductory paragraph and any one of the four sets of criteria, we will find that your impairment meets the listing. Paragraphs A and B contain criteria that describe disorders we consider severe enough to prevent your doing any gainful activity without any additional assessment of functional limitations. For paragraph C, we will assess the degree of functional limitation the additional impairment(s) imposes to determine if it significantly limits your physical or mental ability to do basic work activities, i.e., is a "severe" impairment(s), as defined in §§ 404.1520(c) and 416.920(c). If the additional impairment(s) does not cause limitations that are "severe" as defined in §§ 404.1520(c) and 416.920(c), we will not find that the additional impairment(s) imposes "an additional and significant work-related limitation of function," even if you are unable to do your past work because of the unique features of that work.

7

>   Paragraph D contains the same functional criteria that are required under paragraph B of the other mental disorders listings.

The Listings, 12.00A. The Listings reiterate that they "are so constructed that an individual with an impairment(s) that meets or is equivalent in severity to the criteria of a listing could not reasonably be expected to do any gainful activity." Id.

>   At 12.05, the Listings provide:
>
>   Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.
>
>   The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.
>
>   A. Mental incapacity evidenced by dependence upon others for personal needs (e.g., toileting, eating, dressing, or bathing) and inability to follow directions, such that the use of standardized measures of intellectual functioning is precluded;
>
>   Or
>
>   B. A valid verbal, performance, or full scale IQ of 59 or less;
>
>   Or
>
>   C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function;
>
>   Or
>
>   D. A valid verbal, performance, or full scale IQ of 60 through 70, resulting in at least two of the following:
>
>>   1. Marked restriction of activities of daily living; or
>>
>>   2. Marked difficulties in maintaining social functioning; or
>>
>>   3. Marked difficulties in maintaining concentration, persistence, or pace; or

4. Repeated episodes of decompensation, each of extended duration.

In her decision, ALJ Mason provided several reasons for finding that Plaintiff did not meet Listing 12.05:

(i) the consultative examiner, Dr. S. A. Wurster, dismissed Plaintiff's current scores as "invalid";

(ii) Plaintiff's scores before the age of twenty-two indicated only borderline intellectual functioning;

(iii) Plaintiff did not suffer from "marked" restrictions of activities of daily living, difficulties in maintaining social functioning, or difficulties in maintaining concentration, persistence or pace, nor did he suffer from repeated episodes of decompensation.

(Tr. 220).

An essential criterion in meeting all but paragraph "A" of Listing 12.05 is a "valid" IQ score, and Listing 12.00 specifies that "the narrative report that accompanies the test results should comment on whether the IQ scores are considered valid and consistent with the developmental history and the degree of functional limitation." The Listings, 12.00D6a. Dr. Wurster had administered to Plaintiff a standardized intelligence test recognized by the Listings. (Tr. 454). See The Listings, 12.00D6c. Plaintiff admits that the doctor found the resulting IQ scores were not a valid measure of Plaintiff's intellectual capacity, but argues that Dr. Wurster first stated, "The consistency of the subtest scores on both the Verbal and Performance Scales *would* suggest these results to be a valid index of his present level of mental functioning." (Tr. 453 (emphasis added)). It is apparent, however, that Dr. Wurster's next statement was intended to counter the previous, as if preceded by a "but": "These results are *not* considered a valid index of the client's mental capabilities, as

9

compared with prior evaluations with scores in the borderline range of intelligence."[4] (Id. (emphasis added)).

This interpretation is bolstered by the several other observations that Dr. Wurster made in his report:

• "Much of the time [Plaintiff] 'acted' as though he didn't know anything or that he could not perform even simple tasks given him." (Tr. 453).

• "In the examiner's opinion, [Plaintiff] was malingering and deliberately doing as poorly as possible." (Id.).

• "Since he wasn't actively psychotic or severely brain-damaged, it was concluded he was 'putting on.'" (Id.).

• "Despite reading at a 5th grade level in 1980, the client at this time declared he couldn't read letters or numbers and didn't know the alphabet[.]" (Tr. 454).

• "[His] reproductions of the Bender Gestalt designs were carelessly drawn and thus reflected errors due to poor motivation rather than organicity. His drawing in response to the D.A.P. test was suggestive of deliberative resistance to testing[.]" (Id.).

In his "Summary," Dr. Wurster repeated that Plaintiff's IQ scores "are not a valid index of the client's mental capabilities," and he concluded: "[Plaintiff's] scorable productivity in this evaluation

---

[4]Plaintiff also refers to IQ scores from testing associated with his 1998 application, but the examiner's narrative report suggested that these scores also were not valid. (See Tr. 130 ("His motivation allows interpretation of test results, although his motivation was compromised."; "I cannot be entirely certain that he did not perform intentionally less well that [sic] he was able."; Plaintiff's "errors remain suspicious."); Tr. 132 ("These scores may underestimate [Plaintiff]'s 'true' level of general intelligence[.]"); Tr. 133 (raising the possibility that Plaintiff "performed intentionally worse than he is able")). It is not necessary, however, to address this claim, as ALJ Mason (like ALJ Pope (Tr. 14)) did not rely on these scores in arriving at her step 3 decision.

was so low that the only conclusion to be drawn was that he was malingering and deliberately trying to look mentally impaired[.]" (Id.). Dr. Wurster's diagnoses for Plaintiff included borderline intelligence (by history) – *not* mental retardation – and "malingering." (Id.). Finally, the doctor insisted that Plaintiff was "exaggerating both the severity and extent of his mental symptoms in order to be adjudged disabled," and that Plaintiff was "considered capable of performing in the borderline range, if motivated to do so." (Id.). Clearly, Dr. Wurster could not have made it plainer that he found Plaintiff's November 2005 IQ scores to be invalid. See Lax v. Astrue, 489 F.3d 1080, 1087 (10th Cir. 2007) (affirming ALJ's determination that plaintiff's scores were unreliable when examiner questioned plaintiff's testing effort and the result's validity).

According to his school records, Plaintiff first underwent IQ testing when he was just six years old, achieving a lowest score (performance) of only fifty-five[5]; at age eight,[6] it was recommended that he be placed in a learning disabled, self-contained setting. (Tr. 110). By the age of ten, however, Plaintiff's lowest score had improved to sixty-five, and he was assigned to a resource class for only five hours per week. (Tr. 109). Plaintiff's next IQ results, at age thirteen, were approximated by Dr. Wurster to give a low score of seventy, at which point Plaintiff no longer qualified for separate assistance. (Tr. 452; see also Tr. 106). Plaintiff contends that the significantly lower scores he obtained as an adult are evidence of "organic brain damage" that he suffered as a

---

[5]"In cases where more than one IQ is customarily derived from the test administered, e.g., where verbal, performance, and full scale IQs are provided in the Wechsler series, we use the lowest of these in conjunction with 12.05." The Listings, 12.00D6c.

[6]At age eight, Plaintiff's IQ scores from the Slosson Intelligence Test and the Peabody Picture Vocabulary Test were 85 and 83, respectively. (Tr. 110).

result of severe alcoholism and, thus, ALJ Mason should have evaluated him under Listing 12.02 for "Organic Mental Disorder."

The undersigned finds this claim to be without merit. First, the record contains no "valid" IQ score for Plaintiff from his adult years to suggest such damage. Further, no physician or psychiatrist, either Plaintiff's own or employed by the state, indicated that Plaintiff suffered from organic brain damage. As a layperson, the ALJ would have operated beyond her purview in venturing into this arena without medical expertise. See, e.g., Murphy v. Astrue, 496 F.3d 630, 634 (7th Cir. 2007) ("An ALJ cannot play the role of doctor and interpret medical evidence when he or she is not qualified to do so."); Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999) (as a lay person, an ALJ is "simply not qualified to interpret raw medical data in functional terms"). Finally, ALJ Mason found that Plaintiff did not satisfy the "D" criteria of Listing 12.05, which is identical to the "B" criteria of Listing 12.02. Accordingly, even if the ALJ had considered Listing 12.02, she would not have found that Plaintiff met it.

Plaintiff disagrees with ALJ Mason's rating of his "B" criteria. He points out that, in April 1999, state agency consultant Lisa Smith Klohn found that Plaintiff had marked deficiencies of concentration, persistence or pace.[7] (Tr. 147). This assessment, however, pre-dates the "relevant period" for Plaintiff's 2001 application, which ALJ Mason determined began August 8, 2000, the day after ALJ Pope's decision on Plaintiff's 1998 application (see Tr. 215-16); there is no indication that ALJ Mason relied on Dr. Klohn's findings.

---

[7]Dr. Klohn also opined that Plaintiff's mental functional capacity was affected by drug addiction and alcoholism (see Tr. 138), factors that did not influence ALJ Mason's decision.

Rather, ALJ Mason noted that the records from Plaintiff's mental health treatment indicated "excellent control" of his symptoms while Plaintiff was compliant with his prescribed medications. (Tr. 220). Cf. Gross v. Heckler, 785 F.2d 1163, 1166 (4th Cir. 1986) (if symptoms are, or can be, reasonably controlled by medication, they may not be considered disabling under the Act). Plaintiff's treatment records stated that his concentration was either "intact" or "fair." (Tr. 408, 409, 410, 411, 417, 434). Further, the ALJ noted Plaintiff's testimony that he spent half of each day watching television. (Tr. 220). Hence, substantial evidence supports ALJ Mason's finding.

Plaintiff argues that he has a "marked" limitation in maintaining social functioning, relying upon his own statements and that of a jail officer who said that Plaintiff did not associate with other inmates. Yet in March 2001, Plaintiff began treatment at the county mental health center, interacting over time with psychiatrist David Justice, nurse practitioner Leslie Justice, and psychiatrist William King. (See Tr. 20-21). While maintained on medication, Dr. Justice described Plaintiff as comfortable, relaxed, and calm. (Tr. 408-11).

In addition, Dr. Wurster noted that Plaintiff was cooperative and exhibited no anxiety. (Tr. 21; see also Tr. 452). And the jail officer stated that Plaintiff functioned well at his job in the kitchen. (Tr. 337). See The Listings, 12.00C2 (describing "social functioning," inter alia, as responding appropriately to those in authority and being cooperative with co-workers). Plaintiff also avers that "he is no longer active in church," Pl.'s Br. at 15, yet he testified that he tried to go "every

13

Sunday"[8] (Tr. 499). There thus exists substantial evidence to support ALJ Mason's finding that Plaintiff's experienced no more than moderate difficulties in maintaining social functioning.[9]

Plaintiff next contends that he meets Listing 12.05B which requires (in addition to the diagnostic criteria in the introductory paragraph) a "valid verbal, performance, or full scale IQ of 59 or less." Id. But as discussed hereinabove, Plaintiff's records contain no such "valid" score.

Plaintiff further argues that he meets the criteria of Listing 12.05C, which requires a valid IQ score only between sixty and seventy. Plaintiff's childhood scores meet this criteria, because in the Fourth Circuit, a claimant's IQ is assumed to have remained relatively constant. See, e.g., Luckey v. U.S. Dep't of Health & Human Servs., 890 F.2d 666, 668 (4th Cir. 1989); Turner v. Bowen, 856 F.2d 695, 499 (4th Cir. 1988); Branham v. Heckler, 775 F.2d 1271, 1274 (4th Cir. 1985). Plaintiff must still, however, demonstrate "deficits in adaptive functioning [which] initially manifested during the developmental period,"[10] i.e., before the age of twenty-two.

Plaintiff avers that he meets this criterion because he "was in special education most of his life, leaving school after the 8th grade." Pl.'s Br. at 16-17. But at age ten, Plaintiff's test results indicated "that he scored in the borderline range of intellectual functioning," and his achievement scores placed him only two grades below age level. (Tr. 108). The reviewing psychologist

---

[8]Some months prior to the jailor's statement, Plaintiff's girlfriend attested that he was a deacon in the church. (See Tr. 97).

[9]Interestingly, in March 2001, Plaintiff was living with a girlfriend, her two children, and their 3-year-old child. (Tr. 384). He appeared to still cohabitate with this girlfriend at the time he submitted his application. (See, e.g., Tr. 316). By the time, however, that Plaintiff had his second hearing before ALJ Mason, he had been married to a different woman for a year and a half. (See Tr. 467, 486).

[10]In his Response Brief, Plaintiff equates "deficits in adaptive functioning" with "developmental delays," but gives no legal basis for this definition.

recommended only that Plaintiff be placed into a "resource room to help improve visual-motor perception and vocabulary." (Id.).

Adaptive behavior testing, however, revealed a "regular student" who scored very highly in physical development and socialization. (Tr. 120). Plaintiff's mother, Dora English, reinforced these findings, writing that her son had had no traumatic experiences, accidents, or special fears. (Tr. 114). He liked to ride bicycles and play basketball and football, and participated in the YWCA. Plaintiff had a "supporting" relationship with his family, and his oldest sister taught him track, basketball, and karate.

Mrs. English had observed no problems with Plaintiff's vision, hearing, speech, motor coordination, or emotional stability. (Tr. 115). His general health and eating and sleeping habits were "good." (Id.). At age ten, Plaintiff had never repeated a grade and had strong work habits.

At age twelve, Plaintiff was assessed as "average" in each of eleven categories, except for "below average" in speech development. (Tr. 111). It was agreed that Plaintiff would be placed into a "resource" program for just five hours per week. (Tr. 117). In March 1980, Plaintiff was thirteen years old and in the seventh grade (see Tr. 106), indicating he had passed each grade. After testing, the educational evaluator and psychologist agreed that Plaintiff should be placed into a regular class. (See Tr. 106-07). At the end of seventh grade, it was reported that Plaintiff was "making average progress." (Tr. 103). Regular class placement was recommended, with "'basic' level classes," as Plaintiff "no longer qualifie[d] for special class placement." (Id.). Mrs. English agreed. (Tr. 102).

Plaintiff claims to have left school at this time, but there is no indication in the records of when Plaintiff left school or for what reason. Plaintiff states:

15

> It is not a case of Plaintiff attending school and the records just not being obtained by [the Commissioner] or Plaintiff for his claim, [the state agency] specifically asked for all school records and [individualized educational programs ("IEPs")] and the records were sent by School District 17 under cover letter dated February 22, 1999 (Tr. 101). Plaintiff simply did not return to school after May 1980.[11]

Pl.'s Br. at 17 (footnote added). Plaintiff, however, is mistaken. The cover letter to which he refers reads: "We have enclosed copies of the psychological evaluation reports and the IEP." (Tr. 101). It does *not* purport to forward copies of the whole of Plaintiff's school records and, indeed, only those items referenced hereinabove are contained in the record, dating from February 1975 through May 1980. Accordingly, Plaintiff has failed to establish that he experienced deficits in adaptive functioning prior to age twenty-two.[12] See, e.g., Hunter v. Sullivan, 993 F.2d 31, 35 (4th Cir. 1992) ("Through the fourth step, the burden of production and proof is on the claimant." (citation omitted)).

## **CONCLUSION**

Despite Plaintiff's claims, he fails to show that the Commissioner's decision was not based on substantial evidence. This Court may not reverse a decision simply because a plaintiff has produced some evidence which might contradict the Commissioner's decision or because, if the decision was considered de novo, a different result might be reached.

---

[11] If Plaintiff did leave school after the eighth grade, as he both testified and states in his Brief, then he remained in school for at least one more year after officials determined he was no longer eligible for resource classes.

[12] Plaintiff again refers to Dr. Klohn's assessment, which found the diagnostic criteria satisfied. (See Tr. 144). This finding, however, was not adopted by ALJ Pope in his decision, which relied on the school records in determining, "The evidence fails to show that the claimant has significantly subaverage general intellectual functioning with deficits in adaptive behavior initially manifested before age 22 as required to meet Listing 12.05 for mental retardation." (Tr. 14). Per AR 00-1(4), ALJ Mason's decision was to be informed by this finding.

This Court is charged with reviewing the case only to determine whether the findings of the Commissioner were based on substantial evidence. Richardson v. Perales, supra. Even where a plaintiff can produce conflicting evidence which might have resulted in a contrary decision, the Commissioner's findings must be affirmed if substantial evidence supported the decision. Blalock v. Richardson, supra. The Commissioner is charged with resolving conflicts in the evidence, and this Court cannot reverse that decision merely because the evidence would permit a different conclusion. Shively v. Heckler, supra. It is, therefore,

RECOMMENDED that the Commissioner's decision be **affirmed**.

Joseph R. McCrorey
United States Magistrate Judge

February 23, 2010
Columbia, South Carolina