IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| James J. English, | ) |
| | ) C/A No.: 3:08-2887-MBS |
| Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) |
| Michael J. Astrue, Commissioner of | ) **O R D E R** |
| Social Security, | ) |
| | ) |
| Defendant. | ) |
| | ) |

This is an action brought pursuant to Section 205(g) of the Social Security Act (the "Act"), codified as amended at 42 U.S.C. § 405(g), to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner").

I. PROCEDURAL HISTORY

Plaintiff James J. English alleges that he has been disabled since October 20, 1997 because of paranoia, seeing things that are not there, not liking crowds, and history of stab wound in the left shoulder. Plaintiff filed an application for supplemental security income payments on November 4, 1998. The application was denied initially and upon reconsideration. Plaintiff requested a hearing before an administrative law judge ("ALJ"). The ALJ held a hearing on June 13, 2000. On August 7, 2000, the ALJ issued a decision that Plaintiff was not under a disability as defined in the Social Security Act, and thus was not eligible for supplemental security income payments under sections 1602 and 1614(a)(3)(A) of the Act. TR 239-246. By letter dated May 15, 2001, the Appeals Council determined that there was no basis for granting review of that decision. TR 5.

Plaintiff filed a second application for supplemental security income payments on May 23, 2001. The application was denied initially and upon reconsideration. Plaintiff requested a hearing

before an ALJ. The ALJ held a hearing on August 27, 2003. On September 24, 2003, the ALJ issued a decision that Plaintiff was not eligible for supplemental security income payments under sections 1602 and 1614(a)(3)(A) of the Act. TR 264-271. On March 11, 2005, the Appeals Council vacated the September 24, 2003 decision and remanded the case for further administrative proceedings. The Appeals Council determined that the hearing decision did not reflect an adequate evaluation of the severity of Plaintiff's mental impairment or effects, and did not provide specific findings and appropriate rationales for each of the functional areas described in 20 C.F.R. § 416.920a(c). The Appeals Council further determined that the hearing decision did not contain a function-by-function assessment of Plaintiff's ability to do work-related physical and mental activities or explanation for the restriction to light work. The ALJ was directed to obtain additional evidence concerning Plaintiff's mental impairments, further evaluate Plaintiff's condition, and conduct further proceedings as necessary to determine whether drug addiction and alcoholism were contributing factors material to any finding of disability. The ALJ also was directed to consider the findings of fact made in connection with the August 7, 2000 decision denying benefits, and determine the weight that such findings should be afforded. TR 296-297.

A supplemental hearing was held before the ALJ on November 2, 2005. At the hearing, the ALJ and counsel for Plaintiff discussed the scope of the Appeals Council's remand. The ALJ opined that it appeared she was to "in effect look at the whole . . . case." TR 464. The ALJ noted that, to "play it on the safe side, we will consider [the Appeals Council ruling] as reopening [the August 7, 2000] decision," although the ALJ "never had that happen in all these 31 years that I've been doing this, have the Appeals Council then reopen, if that is what they intended doing, a determination that the Appeals Council had already made that didn't go to the District Court [*sic*] see." TR 465.

On March 22, 2006, the ALJ issued a decision that, based on the application filed on May 23, 2001, the claimant is not eligible for supplemental security income payments under Sections 1602 and 1614(a)(3)(A) of the Act. TR 215-225. The decision of the ALJ became the "final decision" of the Commissioner on November 26, 2007, after the Appeals Council determined that there was no basis for granting Plaintiff's request for review. Plaintiff thereafter brought this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of the "final decision" of the Commissioner.

In accordance with 28 U.S.C. § 636(b) and Local Rule 73.02, D.S.C., this matter was referred to United States Magistrate Judge Joseph R. McCrorey for a Report and Recommendation. On February 23, 2010, the Magistrate Judge filed a Report and Recommendation in which he recommended that the Commissioner's decision to deny benefits be affirmed. Plaintiff filed objections to the Report and Recommendation on March 22, 2010.

This matter now is before the court for review of the Magistrate Judge's Report and Recommendation. The court is charged with making a de novo determination of any portions of the Report of the Magistrate Judge to which a specific objection is made. The court may accept, reject, or modify, in whole or in part, the recommendation made by the Magistrate Judge or may recommit the matter to the Magistrate Judge with instructions. 28 U.S.C. § 636(b).

## II. STANDARD OF REVIEW

The role of the federal judiciary in the administrative scheme established by the Social Security Act is a limited one. Section 205(g) of the Act provides that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ." 42 U.S.C. § 405(g). "Substantial evidence has been defined innumerable times as more than a scintilla, but less than a preponderance." *Thomas v. Celebrezze,* 331 F.2d 541, 543 (4th

3

Cir. 1964). This standard precludes a de novo review of the factual circumstances that substitutes the court's findings for those of the Commissioner. *Vitek v. Finch*, 438 F.2d 1157 (4th Cir. 1971). The court must uphold the Commissioner's decision as long as it is supported by substantial evidence. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972). "From this it does not follow, however, that the findings of the administrative agency are to be mechanically accepted. The statutorily granted right of review contemplates more than an uncritical rubber stamping of the administrative action." *Flack v. Cohen*, 413 F.2d 278, 279 (4th Cir. 1969). "[T]he courts must not abdicate their responsibility to give careful scrutiny to the whole record to assure that there is a sound foundation for the [Commissioner's] findings, and that his conclusion is rational." *Vitek*, 438 F.2d at 1157-58.

The Commissioner's findings of fact are not binding if they were based upon the application of an improper legal standard. *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). However, the Commissioner's denial of benefits shall be reversed only if no reasonable mind could accept the record as adequate to support that determination. *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

III. DISCUSSION

A. The Record

Plaintiff was born on February 8, 1967. In March 1977, Plaintiff was evaluated utilizing the Wechsler Intelligence Scale for Children. Plaintiff was determined to have a verbal IQ of 78, performance IQ of 65, and full scale IQ of 70. The results indicated that Plaintiff possessed a regular student profile with highs in physical development and socialization. TR 356. It was determined that Plaintiff would profit from placement into a resource room to help improve visual-motor perception and vocabulary. TR. 355.

Plaintiff again was evaluated in May 1979. Plaintiff was found to meet the criteria for placement in a special education class and served in a resource program. TR 353. In March 1980 Plaintiff was evaluated using the Wechsler Intelligence Scale for Children and scored a verbal IQ of 77-85, performance IQ of 65-75, and full scale IQ of 71-77. TR 351. It was determined that Plaintiff's intellectual functioning and achievement were in the slow learner range, with spelling and arithmetic lower than reading level. TR 351. On May 12, 1980, it was determined that Plaintiff no long qualified for special class treatment and he was placed in a regular class. TR 103. Plaintiff has a ninth grade education and can read and write.

Prior to 1994 Plaintiff worked tinting windows in vehicles and setting up mobile homes on blocks. Plaintiff was admitted to the hospital in 1997 for five days after he was stabbed in the chest. Plaintiff claims that he continues to experience breathing problems as a result of the injury.

On March 23, 1999, Plaintiff was referred by the Disability Determination Division of the South Carolina Department of Vocational Rehabilitation for a psychological evaluation by Richard E. Getty, Ph.D. Plaintiff was cooperative and friendly during the interview, although somewhat subdued and possibly depressed. It was noted that Plaintiff gave up easily when responding to questions during testing and projected an attitude of defeat. It further was noted that Plaintiff made some improbable errors that were suspicious and may have been intentional. TR 130. Plaintiff appeared to be open and honest during the interview process, although impaired intellectual functioning was obvious. Plaintiff was dressed in clean and appropriate clothing and his personal hygiene appeared to be adequate. Plaintiff displayed appropriate interpersonal skills. *Id.* Plaintiff reported having trouble with his nerves and depression. He had suicidal thoughts and heard voices. Plaintiff had paranoid thoughts and feelings but did not appear to have delusions. Plaintiff drank

approximately twelve beers per day, reporting that he drank heavily to fight off pain and the trauma of his assault. Plaintiff was administered the Wechsler Adult Intelligence Scale-Third Edition test and received a verbal IQ of 57, performance IQ of 55, and full scale IQ of 52. It was opined that "[t]hese scores may underestimate Mr. English's 'true' level of general intelligence because of the comprised motivation which has been noted. An IQ score of 55-60 may be a better estimate." TR 132. Plaintiff's scores on a Mental Health Index evaluation indicated a high level of distress and a need to be referred for counseling and/or more extensive mental health evaluation. TR 133.

On April 6, 1999, Plaintiff was examined by Lisa Smith Klohn, Ph.D. Dr. Klohn found evidence of substance-induced mood disorder and significantly subaverage general intellectual functioning with an IQ of 52. Dr. Klohn noted a question regarding the validity of the test due to lack of motivation. She noted that prior IQ tests were consistently in the borderline range. Dr. Klohn noted alcohol dependence and a history of polysubstance abuse. Dr. Klohn determined that Plaintiff demonstrated moderate limitation in activities of daily living, moderate difficulties in maintaining social functioning, frequent deficiencies of concentration, persistence or pace. TR 140-148. Dr. Klohn further determined that Plaintiff was moderately limited in the ability to understand and remember detailed instructions, to carry out detailed instructions, to maintain attention and concentration for extended periods, to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances. Dr. Klohn found that Plaintiff was moderately limited in the ability to sustain an ordinary routine without special supervision, to work in coordination with or proximity to others without being distracted, and to make simply work-related decisions. Dr. Klohn found that Plaintiff was markedly limited in the ability to complete a normal work day and work week without interruptions from psychologically based symptoms and

to perform at a consistent pace without an unreasonable number and length of rest periods. She determined that Plaintiff was moderately limited in the ability to interact appropriately with the general public, to ask simple questions or request assistance, to accept instructions and respond appropriately to criticism from supervisors. Dr. Klohn found that Plaintiff was moderately limited in the ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes and to maintain socially appropriate behavior. Dr. Klohn further determined that Plaintiff was moderately limited in the ability to respond appropriately to changes in the work setting, to be aware of normal hazards, to travel in unfamiliar places, and to set realistic goals or make plans independently of others. In sum, Dr. Klohn opined that Plaintiff would have difficulty attending to simple tasks due to cognitive deficits, alcoholism, and depressions. Dr. Klohn further opined, however, that if Plaintiff's alcoholism were remitted, he would be considered capable of performing unskilled work, attending work regularly, and interacting appropriately with peers and supervisors on the job. TR 136-138.

On April 27, 2000, Plaintiff was examined by Kathy McNamara, M.D. Plaintiff complained of auditory hallucinations and seeing objects and shapes. Plaintiff complained of an angry and depressed mood with insomnia. He reported suicidal ideation. Plaintiff was prescribed Zyprexa. TR 149.

On March 7, 2001 Plaintiff presented at the Santee-Wateree Mental Health Center complaining of hearing voices telling him to harm himself. Plaintiff reported that he had not been taking his medications for two to three weeks and did much better on medication. Plaintiff reported that when he was on his medication he slept better and did not hear voices. TR 385. Plaintiff was alert and oriented. Plaintiff's diagnosis was "Psychosis, NOS (R/O Schizophrenia)." *Id.* Plaintiff

was prescribed Zyprexa by David A. Justice, M.D. TR. 387.

Plaintiff was seen by Dr. Justice on April 4, 2001. Plaintiff reported being "ok." He denied any active symptoms, suicidal or homicidal ideations, or auditory hallucinations, or delusory paranoia. TR 388.

On May 16, 2001, Plaintiff was seen by Dr. Justice. Plaintiff reported that he was "good." He denied any active symptoms. Plaintiff was continued on Zyprexa. TR 375.

On June 13, 2001, Plaintiff was seen by Dr. Justice. He reported that he was "good." He denied any active symptoms, suicidal or homicidal ideation, or any psychotic symptoms. He appeared to be healthy, well-groomed, and comfortable. Plaintiff was continued on Zyprexa. TR 376.

On September 19, 2001, Plaintiff was seen by Dr. Justice. Plaintiff denied suicidal or homicidal ideation or any psychotic symptoms. Plaintiff appeared to be healthy, well-groomed, and comfortable. His behavior was appropriate and relaxed and no anxiety was noted. Plaintiff was noted to be in jail for nonpayment of child support. Plaintiff was continued on Zyprexa. TR 374.

On December 12, 2001, Plaintiff presented to Dr. Justice. Plaintiff reported that he was fine and he denied any active symptoms. He appeared to be healthy, well-groomed, and comfortable. His behavior was appropriate and relaxed and no anxiety was noted. Dr. Justice increased Plaintiff's dose of Zyprexa slightly. TR 373.

Plaintiff was examined by Dr. Justice on March 20, 2002. Plaintiff reported that he was fine. He denied any active symptoms, suicidal or homicidal ideations, or psychotic symptoms. Plaintiff was continued on Zyprexa. TR 411.

Plaintiff was seen by Dr. Justice on June 17, 2002. Plaintiff reported some difficulty with

breakthrough auditory hallucinations, which was due in large part to running out of his Zyprexa for the previous four days. Plaintiff's denied suicidal or homicidal ideation or any other symptoms. Plaintiff was provided a supply of Zyprexa. TR 408.

Plaintiff presented to Dr. Justice on September 18, 2002. Plaintiff reported being fine. Plaintiff was continued on Zyprexa.

Plaintiff was seen by Dr. Justice on October 16, 2002. He reported that he was "all right" but that he continued to note some mild paranoia in the early afternoon. He denied any suicidal or homicidal ideation. Dr. Justice increased Plaintiff's dose of Zyprexa to address his breakthrough symptoms. TR 404.

On January 2, 2003, Plaintiff was seen by Leslie Justice, APRN, CS. Plaintiff reported that he was not doing well and that he was hearing voices that tell him to walk in the street and do "stupid stuff." Plaintiff denied suicidal or homicidal ideation but admitted to paranoid thoughts and feeling that other people look at him and talk about him. Plaintiff's behavior was cooperative, tense, and guarded. Plaintiff's Zyprexa was increased. TR 405.

Plaintiff was examined by Leslie justice on February 10, 2003. Plaintiff reported that he was not doing well subsequent to a death in the family and that he continued to hear voices during the evening that told him to walk the streets. Plaintiff's appearance was unkempt. His behavior was cooperative but guarded and preoccupied; he was tense and anxious. Plaintiff was continued on Zyprexa. TR 424.

On March 25, 2003, Plaintiff was seen by Leslie Justice. Plaintiff reported doing better but still feeling like people were watching him. Plaintiff stated that he continued to hear voices in the morning but slept well at night. Plaintiff's behavior was cooperative, guarded, and suspicious.

Plaintiff's Zyprexa was increased. TR 423.

Plaintiff was examined by Leslie Justice on April 22, 2003. Plaintiff stated that he heard fewer voices and was less paranoid. Plaintiff's appearance was unkempt and his clothes were wrinkled. Plaintiff's behavior was cooperative, guarded, overly pleasant, and suspicious. Plaintiff's prescription for Zyprexa was increased. TR 422.

Plaintiff was seen by Leslie Justice on July 9, 2003. He had run out of medications and reported hearing voices and not being able to sleep. He reporting thinking that people were talking about him. Plaintiff appeared to be cooperative, tense, guarded, and suspicious. His mood was anxious. Plaintiff was prescribed Zyprexa. TR 421.

Plaintiff was seen by William A. King, M.D. on August 13, 2003. Plaintiff stated that he was doing well on Zyprexa. He denied hallucinations. TR 420.

On November 3, 2003, Plaintiff presented to Leslie Justice. Plaintiff stated that he was depressed and was hearing voices telling him to hurt himself or kill somebody else. Plaintiff admitted to having paranoid ideation. Plaintiff's dosage of Zyprexa was increased. TR 419.

Plaintiff was seen by Leslie Justice on November 17, 2003. He reported that he had been doing well other than hearing voices once to twice per month. Plaintiff reported mild paranoia but stated that it was transient. He denied suicidal or homicidal ideation. Plaintiff was provided by Zyprexa. TR 418.

Plaintiff was seen by Dr. Justice on February 23, 2004. Plaintiff reported an increase in auditory hallucinations and some sleep disturbance. Plaintiff's behavior was appropriate but mild anxiety was noted. Plaintiff's dosage of Zyprexa was increased. Dr. Justice noted that Plaintiff was at risk for decompensation. TR 417.

Plaintiff was seen by Leslie Justice on March 8, 2004. Plaintiff reported hearing voices inside his head that made him feel sad and told him to hurt himself. Plaintiff reported feeling sad and depressed. Plaintiff stated that he largely stayed at home and could not tolerate being around crowds. Plaintiff's behavior was cooperative, slightly guarded and tense. Plaintiff's thought content revealed paranoia, internal auditory hallucinations. Plaintiff was continued on Zyprexa and prescribed Zoloft. TR 416.

Plaintiff presented to Leslie Justice on April 5, 2004. Plaintiff reported that he felt better since starting Zoloft. He stated that he was not hearing as many voices, that they were almost gone completely. Plaintiff was sleeping well and denied suicidal ideation. Plaintiff was more animated that the previous visit. Plaintiff was provided with Zyprexa and Zoloft. TR 415.

Plaintiff was examined by Leslie Justice on May 28, 2004. Plaintiff reported still hearing transient voices. His appearance was plain, groomed, no body order, slightly unkempt, guarded but cooperative. Plaintiff was provided with Zyprexa and Zoloft. TR 414.

On October 29, 2004, Plaintiff presented to Leslie Justice. He stated that he was "a whole lot better." Plaintiff reported hearing voices inside his head that told him to harm himself once or twice a week. Plaintiff reported having gotten married in September. He appeared healthy, coherent, slightly guarded, overly friendly. He was continued on Zoloft and Zyprexa. TR 413.

Plaintiff was examined by Leslie Justice on January 28, 2005. He reported being better than he was. Plaintiff was coherent, slightly guarded, and overly friendly. Plaintiff reported having bad dreams every now and then. Plaintiff was continued on Zoloft and Zyprexa. TR 413.

Plaintiff was examined on April 22, 2005 by Dr. King. Plaintiff reported that his wife had been laid off work and he was unable to purchase his medications. Dr. King provided Plaintiff with

11

Zoloft and Zyprexa. TR 412. At a follow up appointment on July 15, 2008, Plaintiff report "doing a little better" and was continued on Zoloft and Zyprexa.

At the November 2, 2005 hearing before the ALJ, Plaintiff testified that he spends half the day watching television and the other half sleeping. He attends church on Sundays, smokes occasionally, and takes care of personal needs, such as bathing and dressing. Plaintiff's wife provides meals for him. Plaintiff testified that he had ceased drinking alcoholic beverages for approximately a year. See generally TR 459-506.

On November 17, 2005, Plaintiff was examined by Forrest Pommerenke, M.D. Dr. Pommerenke noted that Plaintiff had mild back and shoulder pain not of any major consequence. According to Dr. Pommerenke, Plaintiff appeared to be "a little bit flat and withdrawn." Plaintiff was able to give only a fairly poor history, although he responses to questions were generally appropriate. Plaintiff did not appear to be hallucinating during the visit. Dr. Pommerenke noted that Plaintiff's intelligence seemed to be lower than average. Plaintiff was diagnosed with mental retardation, possible schizophrenia, and status post chest wound of little probable consequence. Dr. Pommerenke opined that Plaintiff's "major problems . . . are psychological. I understand he has an appointment with a psychologist in the next month or so for the purposes of his Social Security disability determination. I think that will be the determining factor, as physically I think he is quite normal." TR 445.

Plaintiff underwent a psychological evaluation by S.A. Wurster, Ph.D., on December 2, 2005. Plaintiff's performance on the Wechsler Adult Intelligence Scale-R indicated a full scale IQ of 54, with a verbal IQ of 59 and performance IQ of 57. The results were not considered a valid index of Plaintiff's mental capabilities as compared with prior evaluations with scores in the borderline range

of intelligence. It was opined that Plaintiff was malingering and deliberately doing as poorly as possible. It was remarked that Plaintiff acted as though he did not know anything or that he could not perform even simply tasks given him. Depression and noticeable anxiety were not in evidence at the time. Plaintiff was able to comprehend and follow simple directions, but most of his responses and performance were not scorable. TR 453. Despite reading at a fifth grade level in 1980, Plaintiff declared that he could not read letters or numbers and did not know the alphabet. Dr. Wurster diagnosed Plaintiff with Schizophrenic Disorder undifferentiated type; R/O Psychosis, N.O.S.; Personality Disorder, N.O.S., with traits of immaturity and dependency; Borderline Intelligence (by history); R/O P.T.S.D., and malingering. Dr. Wurster opined that Plaintiff is able to take care of his personal needs and avoid common physical dangers. Plaintiff was not considered capable of managing his own funds because of his mental illness. TR 454.

B.  The ALJ's Decision

As an initial matter, the ALJ determined that the August 7, 2000 decision would not be reopened, but had become final with respect to the issue of Plaintiff's disability on or before that date. Therefore, the ALJ stated that she would consider the issue of Plaintiff's disability only since August 8, 2000. The ALJ determined that Plaintiff has the following severe impairments: schizophrenia and borderline intellectual functioning. The ALJ determined that these impairments are "severe" within the meaning of the Regulations but not "severe" enough, either singly or in combination, to meet or medically equal one of the listed impairments in Appendix I, Subpart P, Regulations No. 4. The ALJ gave special consideration to Sections 12.03. and 12.05. The ALJ noted Plaintiff had excellent control of his mental symptoms on a relatively consistent medication regimen, with nearly all of his episodes of increased symptoms occurring when he was not compliant

with prescribed medications. The ALJ further found that Plaintiff's mental impairments result in no more than mild restriction of his activities of daily living and no more than moderate difficulties in maintaining social functioning. The ALJ determined that the evidence as to Plaintiff's condition, activities, and capabilities is not consistent with the degree of disabling impairment Plaintiff asserts. The ALJ noted that no physician had suggested specific functional limitations for Plaintiff. The ALJ concluded therefore, that Plaintiff retains the residual functional capacity to perform a range of work at any exertional level, restricted to preclude work in hazardous or dangerous conditions, any climbing of ladders, and work around dangerous machinery. The ALJ further determined that Plaintiff's mental impairments further restrict his residual functional capacity to routine, repetitious, unskilled work involving low levels of job stress. The ALJ found that Plaintiff has the residual functional capacity to return to his past relevant work as a window tinter and in mobile home set-up. The ALJ also concluded that Plaintiff is capable of performing a significant range of work in the national economy, including commercial cleaner, hand packer and bench hand worker, and garment folder. TR 215-225.

C.  The Magistrate Judge's Report and Recommendation

Preliminarily, the Magistrate Judge determined that the ALJ's August 7, 2000 decision was final and any challenge to matters settled in the August 7, 2000 decision is barred by res judicata. The Magistrate Judge concluded that the Appeals Council did not re-open the August 7, 2000 decision, but rather only instructed the ALJ to consider findings in the prior decision in accordance with Social Security Acquiescence Ruling 00-1(14).

Plaintiff argued that the ALJ had failed to consider Plaintiff's IQ test results properly. According to Plaintiff, Dr. Wurster utilized the incorrect test in addition to finding that Plaintiff's

scores were not valid. Plaintiff further asserted that the ALJ failed to evaluate Plaintiff under Listings 12.02,[1] 12.05B, and 12.05C.[2]

---

[1] Listing 12.02 Organic Mental Disorders provides:

> Psychological or behavioral abnormalities associated with a dysfunction of the brain. History and physical examination or laboratory tests demonstrate the presence of a specific organic factor judged to be etiologically related to the abnormal mental state and loss of previously acquired functional abilities.
>
> The required level of severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements in C are satisfied.
>
> A. Demonstration of a loss of specific cognitive abilities or affective changes and the medically documented persistence of at least one of the following:
>
> 1. Disorientation to time and place; or
> 2. Memory impairment, either short-term (inability to learn new information), intermediate, or long-term (inability to remember information that was known sometime in the past); or
> 3. Perceptual or thinking disturbances (e.g., hallucinations, delusions); or
> 4. Change in personality; or
> 5. Disturbance in mood; or
> 6. Emotional lability (e.g., explosive temper outbursts, sudden crying, etc.) and impairment in impulse control; or
> 7. Loss of measured intellectual ability of at least 15 I.Q. points from premorbid levels or overall impairment index clearly within the severely impaired range on neuropsychological testing, e.g., the Luria-Nebraska, Halstead-Reitan, etc.;
> AND
> B. Resulting in at least two of the following:
> 1. Marked restriction of activities of daily living; or
> 2. Marked difficulties in maintaining social functioning; or
> 3. Marked difficulties in maintaining concentration, persistence, or pace; or
> 4. Repeated episodes of decompensation, each of extended duration;
> Or
> C. Medically documented history of a chronic organic mental disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:
> 1. Repeated episodes of decompensation, each of extended duration; or
> 2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be

Plaintiff's contentions are (1) Plaintiff's childhood IQ was lowered significantly in his adulthood because of severe alcoholism, which constituted an organic mental disorder under Listing 12.02; and (2) Plaintiff is mentally retarded based on a full scale IQ under 59, as contemplated by Listing 12.05B; and (3) Plaintiff meets Listing 12.05C because he is mentally retarded with a full scale IQ between 60-70 and another physical or mental impairment that significantly limits his ability to perform work activities.

---

> predicted to cause the individual to decompensate; or
> 3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

[2] Listing 12.05 Mental retardation provides:

> Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.
>
> The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.
>
> A. Mental incapacity evidenced by dependence upon others for personal needs (e.g., toileting, eating, dressing, or bathing) and inability to follow directions, such that the use of standardized measures of intellectual functioning is precluded;
> Or
> B. A valid verbal, performance, or full scale IQ of 59 or less;
> Or
> C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function;
> Or
> D. A valid verbal, performance, or full scale IQ of 60 through 70, resulting in at least two of the following:
> 1. Marked restriction of activities of daily living; or
> 2. Marked difficulties in maintaining social functioning; or
> 3. Marked difficulties in maintaining concentration, persistence, or pace; or
> 4. Repeated episodes of decompensation, each of extended duration.

The Magistrate Judge noted that an essential criterion in meeting the Listings relied upon by Plaintiff is a valid IQ score. The Magistrate Judge pointed out that Dr. Wurster had administered a standardized intelligence test recognized by the Listings and had provided a narrative report accompanying the test results that commented upon whether the IQ scores could be considered valid and consistent with Plaintiff's developmental history and degree of functional limitation. See Listing 12.00. The Magistrate Judge found Dr. Wurster's interpretation of Plaintiff's IQ score to be consistent with other observations made by Dr. Wurster, including his findings that Plaintiff "acted" as though he did not know anything or that could not perform even simple tasks, that Plaintiff was malingering and deliberately doing as poorly as possible, that Plaintiff was "putting on" because he was not actively psychotic or severely brain-damaged, that Plaintiff declared he could not read letters or numbers despite reading at a fifth grade level in 1980; that Plaintiff showed poor motivation and deliberative resistance to testing. Entry 25, 10.

As to Plaintiff's contention that he suffered from organic brain damage because of alcohol abuse, the Magistrate Judge noted that no physician or psychiatrist indicated that Plaintiff suffered from organic brain damage. The Magistrate Judge found, as did the ALJ, that the records from Plaintiff's mental health treatment indicated "excellent control" of his symptoms while Plaintiff was compliant with his medications and that his concentration was "intact" or "fair." The Magistrate Judge noted that Plaintiff did not exhibit a "marked" limitation in maintaining social functioning, given that Plaintiff was able to interact over time with mental health care professionals and was described by them as comfortable, relaxed, and calm. The Magistrate Judge further noted that Plaintiff went to church every Sunday. The Magistrate Judge concluded that substantial evidence supported the ALJ's finding that Plaintiff experienced no more than moderate difficulties in

17

maintaining social functioning.

As to Listing 12.05C, the Magistrate Judge determined that Plaintiff could not demonstrate deficits in adaptive functioning that initially manifested before the age of twenty-two. The Magistrate Judge noted that Plaintiff had a supportive family, that he benefitted from resource placement during his school years, and that at age thirteen Plaintiff had never repeated a grade. Accordingly, the Magistrate Judge recommended that the Commissioner's decision be affirmed.

D.     Plaintiff's Objections

Plaintiff first asserts that the Appeals Council reopened the ALJ's decision of August 7, 2000. The court disagrees. A decision may be reopened within twelve months of the date of notice of the initial determination, for any reason; within two years of the date of the notice of the initial determination upon good cause; or at any time if the decision was obtained by fraud or similar fault. 20 C.F.R. § 416.1488. In this case, the application before the court was filed more than two years after the Appeals Council denied review of the ALJ's August 7, 2000 decision. There is no allegation of fraud or similar fault. Plaintiff's objection is without merit.

Plaintiff next asserts that the ALJ erred in failing to find that Plaintiff meets Listing 12.05C, based upon the IQ score of 55-60 estimated by Dr. Getty in March 1999. The court notes that the evaluation by Dr. Getty revealed possible intentional poor performance by Plaintiff. Even if the court were to accept an IQ score of 55-60, however, the record does not support a finding that Plaintiff has demonstrated deficits in adaptive functioning prior to the age of 22. As the Magistrate Judge correctly observed, Plaintiff had a supportive family, benefitted from resource placement during his school years, and never repeated a grade. It was recommended by the end of seventh grade that Plaintiff was making average progress and should be placed in a regular class.

18

Plaintiff asserts that he has been diagnosed as paranoid schizophrenic, and that his diagnosis significantly limits his ability to perform work-related duties on a sustained basis. The medical record supports a finding, however, that Plaintiff's mental health issues are generally well managed by medication. If a symptom can be reasonably controlled by medication or treatment, it is not disabling. *Gross v. Heckler*, 785 F.2d 1163, 1166 (4th Cir. 1986) (citing *Purdham v. Celebreeze*, 349 F.2d 828, 830 (4th Cir. 1963); 20 C.F.R. § 404.1530).

Plaintiff also contends that the ALJ should have considered the findings of Dr. Klohn that Plaintiff had marked deficiencies of concentration, persistence, and pace. However, as set forth hereinabove, Dr. Klohn questioned Plaintiff's motivation during testing, and also noted that, in her opinion, Plaintiff's would be able to perform unskilled work if he were able to control his alcoholism. Dr. Klohn's assessment is not inconsistent with the Magistrate Judge's and ALJ's determination that Plaintiff is not disabled within the meaning of the Social Security Act. Plaintiff's objections are without merit.

Finally, Plaintiff informs the court that he now has been found disabled on a third reapplication for benefits based upon the same evidence as is present in this case. The court must uphold the factual findings of the Commissioner if they are supported by substantial evidence and were reached through application of the correct legal standard. *Mastro v. Apfel*, 270 F.3d 171, ))) (4th Cir. 2001)(citing *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)). Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the Commissioner. *Id.* at 179 (quoting *Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir. 1987)). A finding of disability by a different ALJ does not impact the limited review undertaken by this court.

19

III. CONCLUSION

After reviewing the entire record, the applicable law, the briefs of counsel, the findings and recommendations of the Magistrate Judge, and Plaintiff's objections, the court adopts the Magistrate Judge's Report and Recommendation and incorporates it herein by reference. For the reasons stated, the Commissioner's decision is **affirmed**.

**IT IS SO ORDERED**.

/s/ Margaret B. Seymour
United States District Judge

Columbia, South Carolina

March 26, 2010.